# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

NESTOR BADILLO-RUBIO

CIVIL ACTION

VERSUS

NO. 18-1092-JWD-RLB

RF CONSTRUCTION, LLC, ET AL.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.      **Introduction,  Background and Summary of Parties' Positions**

1. Plaintiff Nestor Badillo-Rubio ("Plaintiff" or "Badillo-Rubio") brings this action against Defendants RF Construction, LLC ("RF" or "RF Construction") and Caronda Ford ("Ford") (collectively, "Defendants") under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. ("FLSA").[1]

2. At all times pertinent hereto, including the year 2018, Plaintiff worked as a concrete/cement finisher. (Doc. 79, Tr. at 9.)

3. At all times pertinent hereto, including the year 2018, RF Construction was in the business of pouring and finishing concrete. (*Id*. at 73.)

4. Plaintiff claims that RF Construction was a covered "enterprise" for purposes of the FLSA, (Doc. 80 at 10–11, ¶¶ 44–48), for whom he worked as an employee, (*id*. at 2–3, ¶¶ 4–9).

5. It is stipulated that "RF Construction, LLC paid [Plaintiff] $200 per day for his labor." (Doc. 57 at 2; *see also* Doc. 80 at 2, ¶ 2; Doc. 81 at 3, ¶ 25.)

6. It is stipulated that "Caronda Ford is a managing member of RF Construction, LLC." (*Id*.; *see also* Doc. 80 at 2, ¶ 1; Doc. 81 at 3, ¶ 24.)

---

[1] Stucco Friends was originally sued as a co-defendant of RF Construction but settled with Plaintiff on September 27, 2019 and was dismissed. (Doc. 24.)

7. It is stipulated that "RF Construction, LLC had gross revenue of $500,000.00 or more in 2018." (*Id.*; *see also* Doc. 80 at 2, ¶ 3; Doc. 81 at 3, ¶ 26.)

8. Plaintiff claims that, in violation of the FLSA, Defendants failed to pay him overtime wages entitling him to $2,602.08 plus liquidated damages, attorneys fees and costs. (Doc. 80 at 13–14, ¶¶ 57–58.)

9. Plaintiff claims that Ford, as the sole managing member of RF was, along with RF, a joint employer of Plaintiff and jointly and severally liable for wages, liquidated damages, attorney's fees and costs. (*Id.* at 14–16, ¶¶ 59–70.)

10. Plaintiff claims that a suit by RF Construction against Plaintiff in Baton Rouge City Court for repayment of a loan supposedly made to Plaintiff in lieu of workers' compensation benefits was in violation of FLSA's anti-retaliation provision entitling Plaintiff to damages for mental and emotional worry. (*Id.* at 17–19, ¶¶ 75–84.)

11. Defendants claim that RF Construction was and is not an "enterprise" covered by the FLSA (Doc. 81 at 11–13, ¶¶ 96–108) and Plaintiff was an independent contractor, not an employee entitled to benefits of the FLSA (*id.* at 5–11, ¶¶ 18–95). Therefore, Defendants owe nothing to Plaintiff.

12. Defendants argue that certain of Plaintiff's claims are time-barred. (*Id.* at 4–5, ¶¶ 34–37.)

13. Defendants deny the suit brought by them in Baton Rouge City Court was in retaliation for Plaintiff's FLSA suit but rather was for the repayment of a loan made to help Plaintiff after he was injured and has merit. (*Id.* at 13–15, ¶¶ 109–129.)

14. Trial began on February 25, 2021 by Zoom but because of technical problems, the trial was continued and rescheduled to resume in court on June 16, 2021. (Doc. 74.)

15. At the trial, the following witnesses testified: Nestor Badillo Rubio, Caronda Ford, Monica Alcerro, and Jorge Castillo. (Doc. 79.)

16. Following the in-court trial of June 16, 2021, a transcript of the trial was filed into the record on August 10, 2021. (*Id.*) Plaintiff and Defendants filed Proposed Findings of Fact and Conclusions of Law (Docs. 80 and 81) on August 23 and 24, 2021 respectively.

17. All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed. Likewise, any conclusion of law more appropriately considered a finding of fact is to be so classified.

**II.    Issues**

18. The Court must resolve the following issues:

   a.  Was RF Construction a covered enterprise for purposes of the FLSA?

   b.  For purposes of the FLSA, was Plaintiff an employee or independent contractor of RF Construction?

   c.  Are all or some of Plaintiff's claims time-barred?

   d.  If an employee of RF, what sums for overtime wages, if any, are owed to Plaintiff?

      i.  What records were kept by each party?

      ii.  What were Plaintiff's hours worked for RF Construction? Specifically, how many hours did he work from January 27, 2018 to April 14, 2018; May 11, 2018, and September 22, 2018 to October 6, 2018?

   e.  Is Ford a joint employer of Plaintiff and therefore jointly and severally liable with RF Construction for Plaintiff's claimed damages?

3

f.  Is Plaintiff entitled to liquidated damages from RF and/or Ford, or did Defendant(s) act reasonably and in good faith (in which case, liquidated damages would not be due)?

g.  Is Plaintiff entitled to attorney's fees?

h.  Was RF Construction and Ford's suit against Plaintiff for repayment of a loan Plaintiff made in retaliation for Plaintiff's FLSA suit against RF entitling Plaintiff to damages and, if so, what damages were suffered?[2]

## III.    Findings of Fact

19. Plaintiff is not a native English speaker and testified through an interpreter. (Doc. 79, Tr. at 3.) He has an elementary school level of education. (*Id.* at 12.) The Court found Plaintiff to be a credible witness.

20. Plaintiff described his profession generally as "construction", (*id.* at 8–9), but more specifically, as a "cement finisher or concrete finisher", (*id.* at 9).

21. He testified that his concrete finishing work involved constructing the forms into which the cement or concrete is poured, assisting in the pouring of the concrete, and once poured, smoothing it. (*Id.* at 10–11.)

22. Both Plaintiff and Defendants characterize the nature of Plaintiff's work as "labor". It is stipulated that "RF Construction, LLC paid [Plaintiff] $200 per day for his labor." (Doc. 57 at 2; *see also* Doc. 80 at 2, ¶ 2; Doc. 81 at 3, ¶ 25; Doc. 81 at 6, ¶ 49 ("Furthermore, Mr. Badillo-Rubio was simply a day laborer hired at $200 per day on an as needed basis."); Doc. 81 at ¶ 48 (RF "only provided labor" for the jobs).)

---

[2] The suit was filed in Baton Rouge City Court in April 2021. (Doc. 79, Tr. at 4; Plaintiff's Exhibit 6) The parties agreed that despite this issue not being raised in the Complaint or in the Pretrial Order, the issue could be tried at the June 16, 2021 trial. (Doc. 79, Tr. at 4-6.)

23. Although there was a modest dispute as to which tools were provided by RF and which were provided by Plaintiff, the parties were largely in agreement. Plaintiff argues that

> RF Construction LLC purchased and/or provided most tools, equipment and materials [for each job], including, but not limited to table saws, building materials (cement, wood, and nails), specialized hand tools such as trowels and pneumatic nail guns, and other equipment such as Bobcats and cement pump trucks. Additionally, RF Construction, LLC provided a box trailer that contained a significant portion of the tools and equipment for each project.

(Doc. 80 at 2–3, ¶ 8 (citing Doc. 79, Tr. at 13–16).)

24. Defendants concede that "RF Construction provides the machinery, the more expensive machinery for work, but [the laborers like Plaintiff] bring their tools." (Doc. 81 at 7, ¶ 58, quoting testimony of Jorge Castillo, Doc. 79, Tr. at 144, 159.) Defendants agree that among the more expensive equipment owned by RF is a Bobcat and a work trailer with various tools including table saws, pneumatic guns, and other handheld tools. (Doc 79, Tr. at 74–75.).[3]

25. Defendants also argue that Plaintiff owned a trowel machine which he sometimes rented to RF. (Doc. 81 at 7, ¶ 57.) Plaintiff denies having rented any equipment to RF. (Doc. 79, Tr. at 52.)

26. The parties agree (and the Court holds) that most tools, including the more expensive and specialized tools were provided by RF and that RF did so by way of a box trailer which it owned and brought to a job site. The Court finds that the tools and equipment provided by RF included building materials (cement, wood, and nails), specialized hand tools such as trowels and pneumatic nail guns, and other larger equipment such as Bobcats and

---

[3] Ford testified that RF owned the work trailer but it was registered in the name of Castillo. (Doc. 79, Tr. at 74.)

excavators. In some instances, the equipment was owned by RF and in others, rented by RF on an as-needed basis.

27. It is undisputed that Plaintiff did not participate in business acquisition for RF and never bid his own work to RF. (Doc. 79, Tr. at 13.) He did not purchase the concrete or choose the projects RF engaged in. (*Id*. at 16.) Rather, a representative from RF would tell Plaintiff which project he was to work on, and when to start and finish his work. (*Id*.)

28. Jorge' Castillo Rodriguez ("Castillo") testified on behalf RF Construction. The Court found his testimony less than credible. For instance, Castillo originally described himself as a "foreman" for RF Construction. (*Id.* at 142.) On further questioning by the Court, however, he admitted that he had an ownership interest in RF and shared in the profits. (*Id*. at 170–71.) "Well, so I'm the one in charge of the profits or gains for the company, so basically you could say that I am in charge of the money of the company." (*Id*. at 172.)

29. Furthermore, in response to a question about excavators used by RF on its jobs, he initially testified he was "the owner of machinery". (*Id*. at 166.) On further questioning by the Court, however, he admitted that while he owned one of the excavators, he and RF shared ownership of the other. (*Id*. at 168.)

30. The source of Castillo's bias in favor of Defendants was made obvious during his testimony. He testified that "between her [Ford] and I, and I repeat, I'm very thankful for her. She helped me when I needed it the most. . . . She came out of nowhere to help me." (*Id*. at 161.)

31. Castillo testified that, as RF's representative, he would call Plaintiff and others to work at a given site and that sometimes Plaintiff was unavailable because he was doing a variety of jobs for others. (*Id*. at 143.)

6

32. Castillo stated that the number of hours Plaintiff and others worked varied from job to job. (*Id*. at 146–147.) However, he admitted that "RF Construction would not track the number of hours [Plaintiff] worked in a work week", (*id.* at 159), and did not keep time sheets, (*id.* at 160). (*See also id.* at 81, Testimony of Ford, to same effect.) He admitted that he did not know the number of hours Plaintiff worked in a given week. (*Id*.)

33. The Court accepts Plaintiff's testimony and evidence regarding the work he performed for RF Construction including that he worked 12 hours per day on the days and weeks set out in Joint Exhibit 1 and was paid as set out in Joint Exhibit 2. (*Id.* at 19–21 and Joint Exhibits 1 and 2.)

34. Specifically, broken out week by week for the time in 2018 Plaintiff worked for RF, the Court accepts his testimony and evidence as set out in Plaintiff's Proposed Findings of Fact and Conclusions of Law. (Doc. 80, ¶¶ 12–27.)

35. For the work week ending on January 27, 2018, Mr. Rubio worked five days for RF Construction, LLC. During those five days, Mr. Rubio worked at least sixty hours, which includes twenty hours of overtime. (Joint Exhibits 1 and 2; Doc. 79, Tr. at 19–21.)

36. For the work week ending on February 2, 2018, Mr. Rubio worked six days for RF Construction, LLC. During those six days, Mr. Rubio worked at least seventy-two hours, which includes thirty-two hours of overtime. (Joint Exhibits 1 and 2; Doc. 79, Tr. at 19–21.)

37. For the work week ending on February 10, 2018, Mr. Rubio worked four days for RF Construction, LLC. During those four days, Mr. Rubio worked at least forty-eight hours, which includes eight hours of overtime. (Joint Exhibits 1 and 2; Doc. 79, Tr. at 19–21.)

38. For the work week ending on February 16, 2018, Mr. Rubio worked four days for RF Construction, LLC. During those four days, Mr. Rubio worked at least forty-eight hours, which includes eight hours of overtime. (Joint Exhibits 1 and 2; Doc. 79, Tr. at 19–21.)

39. For the work week ending on February 23, 2018, Mr. Rubio worked five days for RF Construction, LLC. During those five days, Mr. Rubio worked at least sixty hours, which includes twenty hours of overtime. (Joint Exhibits 1 and 2; Doc. 79, Tr. at 19–21.)

40. For the work week ending on March 2, 2018, Mr. Rubio worked four days for RF Construction, LLC. During those four days, Mr. Rubio worked at least forty-eight hours, which includes eight hours of overtime. (Joint Exhibits 1 and 2; Doc. 79, Tr. at 19–21.)

41. For the work week ending on March 9, 2018, Mr. Rubio worked six days for RF Construction, LLC. During those six days, Mr. Rubio worked at least seventy-two hours, which includes thirty-two hours of overtime. (Joint Exhibits 1 and 2; Doc. 79, Tr. at 19–21.)

42. For the work week ending on March 16, 2018, Mr. Rubio worked three and one-half days for RF Construction, LLC. During those three and one-half days, Mr. Rubio worked at least forty-two hours, which includes two hours of overtime. (Joint Exhibits 1 and 2; Doc. 79, Tr. at 19–21.)

43. For the work week ending on March 24, 2018, Mr. Rubio worked six days for RF Construction, LLC. During those six days, Mr. Rubio worked at least seventy-two hours, which includes thirty-two hours of overtime. (Joint Exhibits 1 and 2; Doc. 79, Tr. at 19–21.)

44. For the work week ending on March 31, 2018, Mr. Rubio worked five and one-half days for RF Construction, LLC. During those five and one-half days, Mr. Rubio worked at least

sixty-six hours, which includes twenty-six hours of overtime. (Joint Exhibits 1 and 2; Doc. 79, Tr. at 19–21.)

45. For the work week ending on April 9, 2018, Mr. Rubio worked six days for RF Construction, LLC. During those six days, Mr. Rubio worked at least seventy-two hours, which includes thirty-two hours of overtime. (Joint Exhibits 1 and 2; Doc. 79, Tr. at 19–21.)

46. For the work week ending on April 14, 2018, Mr. Rubio worked three days for RF Construction, LLC. During those three days, Mr. Rubio worked at least thirty-six hours. (Joint Exhibits 1 and 2; Doc. 79, Tr. at 19–21.)

47. For the work week ending on May 11, 2018, Mr. Rubio worked three and one-half days for RF Construction, LLC. During those three and one-half days, Mr. Rubio worked at least forty-two hours, which includes two hours of overtime. (Joint Exhibits 1 and 2; Doc. 79, Tr. at 19–21.)

48. For the work week of September 22, 2018, Mr. Rubio worked six days for RF Construction, LLC. During those six days, Mr. Rubio worked at least seventy-two hours, which includes thirty-two hours of overtime. (Joint Exhibits 1 and 2; Doc. 79, Tr. at 19–21.)

49. For the work week of September 29, 2018, Mr. Rubio worked five days for RF Construction, LLC. During those five days, Mr. Rubio worked at least sixty hours, which includes twenty hours of overtime. (Joint Exhibits 1 and 2; Doc. 79, Tr. at 19–21.)

50. For the work week of October 6, 2018, Mr. Rubio worked six and three-quarters days for RF Construction, LLC. During those six and three-fourth days, Mr. Rubio worked at least seventy-eight hours, which includes thirty-eight hours of overtime. (Joint Exhibits 1 and 2; Doc. 79, Tr. at 19–21.)

51. Plaintiff was never paid overtime wages.

52. RF Construction, LLC is a limited liability company and is a "manager managed LLC. (Doc. 79, Tr. at 86.) Ford is the sole manager. (*Id*.)

53. Ford testified that "[t]he business of RF Construction, LLC is primarily pouring and finishing concrete." (*Id.* at 73.)

54. She stated that RF owned a computer which was connected to the internet and has the following software: Microsoft, Powerpoint, Excel and Quickbooks. (*Id*. at 75.) It utilizes Microsoft Word. (*Id*. at 76.) RF utilizes AT&T for its phone service. (*Id*. at 76-77.) RF's phone is a Samsung Galaxy. (*Id*. at 77.)

55. While Defendants claim they have no employees, RF listed six employees on its application for a PPP Loan from the SBA. (*Id*. at 87-88.) However, according to Ford, there was no place on the forms to list independent contractors and the paperwork she submitted with the form made it clear she considered them independent contractors. (*Id*. at 91–94.)

56. As is explained in more detail in the Conclusions of Law section, the Court finds that RF Construction is a covered enterprise for purposes of the FLSA.

57. As is explained in more detail in the Conclusions of Law section, the Court finds that Plaintiff's claim arising from work performed for RF in 2018 was filed timely.

58. As is explained in more detail in the Conclusions of Law section, the Court finds that Plaintiff is an employee of RF for purposes of the FLSA and that RF owes Plaintiff overtime wages.

59. As is explained in more detail in the Conclusions of Law section, Ford is, along with RF, a joint employer of Plaintiff and is jointly and severally liable with RF Construction for Plaintiff's overtime wages in the amount of $2,602.08.

60. As is explained in more detail in the Conclusions of Law section, the Court finds that Plaintiff is entitled to liquidated damages from RF and Ford, jointly and severally, in the amount of $2,608.02.

61. As is explained in more detail in the Conclusions of Law section, the Court finds that RF and Ford's civil suit against Plaintiff filed in the Baton Rouge City Court was brought in retaliation for Plaintiff's FLSA claim against RF and Plaintiff is entitled to emotional distress damages in the amount of $2,500.00.

62. As is explained in more detail in the Conclusions of Law section, the Court finds that Plaintiff is entitled to a judgment against RF and Ford jointly and severally for attorney's fees and costs in an amount to be set by the Court.

## IV. Conclusions of Law

### A. Jurisdiction

63. This Court enjoys subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 because it arises under the FLSA.

### B. FLSA Generally

64. The FLSA provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." *Johnson v. Heckmann Water Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014) (quoting 29 U.S.C. § 207(a)(1)).

65. "An employee bringing an action for unpaid overtime compensation must first demonstrate by a preponderance of the evidence: (1) that there existed an employer-employee relationship during the unpaid overtime periods claimed; (2) that the employee engaged in

11

activities within the coverage of the FLSA; (3) that the employer violated the FLSA's

overtime wage requirements; and (4) the amount of overtime compensation due." *Id.*

(citing *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005)).

**C. Coverage under the FLSA - Enterprise Engaged in Commerce**

66.  The parties dispute whether RF Construction was an "enterprise" for purposes of the

FLSA.

67. The FLSA generally guarantees overtime pay to "any . . . employee[] who in any workweek

. . . is employed in an enterprise engaged in commerce or in the production of goods for

commerce[.]"  29 U.S.C. § 207(a)(1).

68. Under the FLSA, an "Enterprise engaged in commerce or in the production of goods for

commerce" means an enterprise that--

> (A)(i) has employees engaged in commerce or in the production of
> goods for commerce, or *that has employees handling, selling, or
> otherwise working on goods or materials that have been moved in
> or produced for commerce by any person;* and

> (ii) is an enterprise whose annual gross volume of sales made or
> business done is not less than $500,000 (exclusive of excise taxes at
> the retail level that are separately stated);

29 U.S.C. § 203(s)(1)(A)(i)–(ii) (emphasis added)

69. The FLSA defines "enterprise" in relevant part as follows:

> "Enterprise" means the related activities performed (either through
> unified operation or common control) by any person or persons for
> a common business purpose, and includes all such activities whether
> performed in one or more establishments or by one or more
> corporate or other organizational units including departments of an
> establishment operated through leasing arrangements, but shall not
> include the related activities performed for such enterprise by an
> independent contractor.

29 U.S.C. 203(r)(1).

70. The term "materials" as used in the FLSA means "tools or other articles necessary for doing or making something" which "have a significant connection with the employer's commercial activity." *Polycarpe v. E&S Landscaping Serv., Inc.*, 616 F.3d 1217, 1221–27 (11th Cir. 2010).

71. Again, RF Construction, LLC had gross revenue of $500,000.00 or more in 2018. (Stipulated Fact 3, Doc. 57 at 2.)

72. Defendants argue that RF is not an enterprise for three reasons: first, since RF had no employees (including Plaintiff), there were no employees handling, selling, or otherwise working on goods or materials…", (Doc. 81 at 11–12, ¶¶ 98–105); second, the definition of enterprise excludes "the related activities performed for such enterprise by an independent contractor" and Plaintiff was an independent contractor, (*id*. at 11–12, ¶ 100); third, RF "does not perform any construction jobs outside of the state of Louisiana and therefore, is not engaged in interstate commerce", (*id*. at 13, ¶ 108).

73. The credible evidence in this case refutes Defendants' position. First, as is explained in greater detail *infra*, the Court finds that Plaintiff was a covered employee of RF under the FLSA.

74. Second, both Plaintiff and RF (through Ford), "*handl[ed], [sold], or otherwise work[ed] on goods or materials that have been moved in or produced for commerce by any person.*" Plaintiff used power tools provided by RF and manufactured by Dewalt. (Doc. 79, Tr. at 17-18.) He used other tools provided by RF including a table saw, pneumatic nail gun, trowels, a Bobcat and a pump truck for pouring concrete. (*Id*. at 13–15.) RF provided the tools and equipment listed but also utilized a computer connected to the internet and

software programs including Microsoft Word as well as a Samsung Galaxy cellphone utilizing AT&T cell service. (*Id*. at 75–77.) *See* Fed. R. Civ. P. 201(b)(2).

75. The Court finds that RF is an enterprise for purposes of the FLSA. *Polycarpe*, 616 F.3d at 1221-27; *see also Molina-Aranda v. Black Magic Enters., L.L.C.*, 983 F.3d 779, 786-88 (5th Cir. 2020); *Bancroft v. 217 Bourbon, LLC*, No. 21-545, 2021 WL 3423587, at *4 (E.D. La. Aug. 5, 2021).

### D.  Employer-Employee Relationship

76. The parties dispute whether Plaintiff was an employee of RF Construction or an independent contractor.

77. Again, "[t]he FLSA requires employers to pay employees at least one-and-one-half times the regular hourly rate for hours worked in excess of forty hours per week." *Hobbs v. Petroplex Pipe & Constr., Inc.*, 946 F.3d 824, 829 (5th Cir. 2020) (citing 29 U.S.C. § 207(a)(1)). "Independent contractors are exempt from such requirement." *Id.*

78. "In determining employee/independent contractor status, the 'relevant question is whether the alleged employee so economically depends upon the business to which he renders his services, such that the individual, as a matter of economic reality, is not in business for himself.' " *Id.* (quoting *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 845 (5th Cir. 2010)).

79. The Fifth Circuit "utilizes 'five non-exhaustive factors' to guide this inquiry." *Id.* (citing *Hopkins v. Cornerstone Am*., 545 F.3d 338, 343 (5th Cir. 2008)). "These 'economic realities' or *Silk*[4] factors are: '(1) the degree of control exercised by the alleged employer;

---

[4] The *Silk* factors are so named after *United States v. Silk*, 331 U.S. 704 (1947).  *See Hobbs*, 946 F.3d at 829 n.2.

(2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship.' " *Id*. (quoting *Hopkins*, 545 F.3d at 343).

80. " 'No single factor is determinative. Rather, each factor is a tool used to gauge the *economic dependence* of the alleged employee, and each must be applied with this ultimate concept in mind.' " *Id.* (quoting *Hopkins*, 545 F.3d at 343) (internal citations omitted).

81. "These factors are not exhaustive, nor can they be applied mechanically to arrive at a final determination of employee status. Rather, they must always be aimed at an assessment of the 'economic dependence' of the putative employees, the touchstone for this totality of the circumstances test." *Brock v. Mr. W Fireworks, Inc*., 814 F.2d 1042, 1043 (5th Cir. 1987) (citations omitted).

82. Therefore, "facile labels and subjective factors are only relevant to the extent that they mirror 'economic reality' ". *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 380 (5th Cir. 2019) (quoting *Brock*, 814 F.2d at 1044 (citing *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961))). "Stated differently, 'it is not what [plaintiffs] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive' ". *Id.* (quoting *Brock*, 814 F.2d at 1047 (emphasis in original) (citations omitted)); *see also Brock*, 814 F.2d at 1053 ("[O]nly the economic realities are legally relevant". (citation omitted)); *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1312 (5th Cir. 1976) ("The controlling economic realities are *reflected by the way one actually acts*." (emphasis added) (footnote omitted)).

83. As to the first *Silk* factor, " '[c]ontrol is only significant when it shows an individual exerts such control over a meaningful part of the business that [the individual] stands as a separate economic entity.' " *Hobbs*, 946 F.3d at 830 (quoting *Parrish*, 917 F.3d at 381  (quoting *Usery*, 527 F.2d at 1312–13 (5th Cir. 1976))).  "The relevant determination is whether 'the worker has a viable economic status that can be traded to other companies, keeping in mind that lack of supervision of the individual over minor regular tasks cannot be bootstrapped into an appearance of real independence.' " *Id*. (quoting *Parrish*, 917 F.3d at 381 (cleaned up)).

84. Thus, for example, in *Hobbs*, the Fifth Circuit found that the first factor weighed in favor of employee status. *Hobbs*, 946 F.3d at 830.   The Court reached this decision because: (1) the employer "regularly assigned the pipewelders' specific tasks and the hours to be worked"; (2) the employer "set the welders' schedule and typically required them to work from 7:00 AM to 5:00 PM; (3) "[t]he welders were sometimes required to work late, and [one] testified that he did not turn down assignments or refuse requests to stay late for fear it could lead to termination of his employment;" (4) the welder also "testified that, if the pipe welders showed up to work late, they would be sent home for the day"; and (5) "the welders testified that they never refused to work on assigned projects." *Id.*  Further, the appellate court found that this factor weighed in favor of employee status despite the fact that client "determined the specifications for the pipe welders' work and inspected the welding" and despite the fact that there were instances where the welders "missed work for weeks at a time, which militate[d] against employer control of their schedule." *Id.*  The Fifth Circuit said, "control over the welders' schedule, combined with evidence that it would discipline the welders for arriving to work late, suggests employee status." *Id.*

(citation omitted).  The Court also emphasized that the employer assigned the plaintiffs tasks, including some other than pipe welding (such as "work[ing] at its maintenance shop a handful of times and requir[ing] him to sometimes drive a forklift"). *Id.* at 830–31.

85. The second factor is "the extent of the relative investments of the worker and the alleged employer." *Id.* at 829.  "In considering this factor, 'we compare each worker's *individual* investment to that of the alleged employer.' " *Id.* at 831 (quoting *Hopkins*, 545 F.3d at 344).

86. Thus, for example, in *Hopkins*, the Fifth Circuit found,

> Here, it is clear that Cornerstone's investment—including maintaining corporate offices, printing brochures and contracts, providing accounting services, and developing and underwriting insurance products—outweighs the personal investment of any one Sales Leader. Cornerstone does not dispute this, but argues that the Sales Leaders made "substantial investments" in their individual offices. While this may be true, Cornerstone's greater overall investment in the business scheme convinces us that the relative-investment factor weighs in favor of employee status.

*Hopkins*, 545 F.3d at 344.

87. Similarly, in *Hobbs*, the Court found, "Given the significant sums that Petroplex invested in those projects" ("approximately $500,000 at each construction site")—"and notwithstanding the substantial sums invested by Hobbs and Feeney" (or over $70,000 by each employee in welding trucks and equipment)—"it was not clearly erroneous for the district court to conclude that this factor cut in favor of employee status." *Hobbs*, 946 F.3d at 831–32.

88. The third factor is "the degree to which the worker's opportunity for profit or loss is determined by the alleged employer". *Id.* at 829.  " 'In evaluating this factor, it is important to determine how the workers' profits depend on their ability to control their own costs. For that purpose, evidence gleaned from tax returns can be useful.' " *Id.* at 832 (quoting

*Parrish*, 917 F.3d at 384 (cleaned up)). The Fifth Circuit "has additionally looked to whether the putative employer's control over the worker's schedule and pay had the effect of limiting the worker's opportunity, as an independent contractor, for profit or loss." *Id.* (citing *Cromwell v. Driftwood Elec. Contractors, Inc.*, 348 F. App'x 57, 61 (5th Cir. 2009)).

89. Thus, for example, in *Hobbs*, the Fifth Circuit found based on the record as a whole that the district court did not err in finding that this third factor weighed in favor of employee status. *Id.* at 833. The appellate court based this conclusion on the facts that (1) the welders "testified that they never negotiated their rate of pay"; (2) the claimed employer "fixed the hourly rate of pay" ; (3) the work schedule imposed by the employer "severely limited the pipe welders' opportunity for profit or loss" because they worked "more than forty hours a week" and, on average, from 7:00 AM to 5:00 PM six days a week, so "it [wa]s significant that the pipe welders' schedule for [the company] effectively prevented them from engaging in outside work"; and (4) "the welders' year-end profits or losses did not depend on their ability to find welding work with other companies consistently or other work generally." *Id.* at 833–34 (citations omitted). The Fifth Circuit also found "it irrelevant to the opportunity for profit or loss inquiry that the pipe welders could hypothetically negotiate their rate of pay because, under the economic realities test, it is not what the putative employees *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive." *Id*. at 833 (cleaned up).

90. Further, when, for "the most part, the [worker's] only 'expenditures' from which they . . . obtain a return is [on] their own labor[,] [s]uch returns are more properly classified as wages, not profits." *Brock*, 814 F.2d at 1050 (cleaned up). "By contrast, profit is the gain

realized from a business over and above its capital expenditures." *Id.* at 1050–51 (cleaned up).

91. Thus, in *Brock,* the Fifth Circuit found this factor weighed in favor of employee status because "the record reveals that these operators are far more closely akin to wage earners toiling for a living, than to independent entrepreneurs seeking a return on their risky capital investments." *Id.* at 1051.

92. The fourth factor is "the skill and initiative required in performing the job[.]" *Hobbs*, 946 F.3d at 829. " 'Greater skill and more demonstrated initiative counsel in favor of [independent contractor] status.' " *Id.* at 834 (quoting *Parrish*, 917 F.3d at 385). Conversely, "[r]outine work which requires industry and efficiency is not indicative of independence and nonemployee status." *Hopkins*, 545 F.3d at 345 (quoting *Usery*, 527 F.2d at 1314). "Relevant to the initiative inquiry is the extent of discretion the worker has over his daily tasks and whether he must take initiative to find consistent work." *Hobbs*, 946 F.3d at 834 (citing *Parrish*, 917 F.3d at 385); *see also Hopkins*, 545 F.3d at 345 ("Generally, [the Fifth Circuit] look[s] for some unique skill set . . . or some ability to exercise significant initiative within the business[.]" (internal citations omitted)).

93. "The final *Silk* factor to be considered is the permanency of the relationship." *Hobbs*, 946 F.3d at 834. "Relevant to this factor is 'whether any plaintiff "worked exclusively" ' for the alleged employer, " 'the total length of the relationship,' " and " 'whether the work was on a "project-by-project basis." ' " *Id.* (quoting *Parrish*, 917 F.3d at 387). "But ultimately, '[t]he inferences gained from the length of time of the relationship depend on the surrounding circumstances.' " *Id.* (quoting *Parrish*, 917 F.3d at 387).

94. Thus, in *Hobbs*, the Fifth Circuit found that this factor weighed in favor of employee status because the company "hired the pipe welders to work on all its pipe welding work as needed, and not on a project-by-project basis." *Id.* at 835–36.  The Court reached this result despite the fact that the client hired the company on a project basis because "[t]he key question is not whether . . . [the company's] customer, used [the company] on a project basis but whether [the company] hired its welders for only specific projects." *Id.* at 835. Further, the welders worked exclusively for the company during the time period, and they worked for the company "for a substantial period of time"---one for almost three years, and another ten months. *Id.* The Fifth Circuit stated:

> We find the length of the pipe welders' relationship with Petroplex to more closely resemble the tenure of the workers in cases where we have found the permanency of the relationship factor to weigh in favor of employee status than the tenure of the workers in cases where we have found independent contractor status. *Compare* [*Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 622, 666 (5th Cir. 1983)] ("The duration of the relationship was from ten months to three years for each [welder]—a substantial period of time—and except for insignificant work elsewhere, was exclusive[ ]."); *with* [*Carrell v Sunkind Const., Inc.*, 998 F.2d 330, 334 (5th Cir. 1993)] (finding independent contractor status where average number of weeks worked for the alleged employer varied from approximately three to sixteen weeks per year).

*Id.* at 835.

95. Because the *Silk* factors are non-exhaustive, courts "look to other factors to help gauge the economic dependence of the pipe welders." *Id.* at 836 (finding that certain factors— including not wearing uniforms, not using company vehicles, and not receiving an employee handbook—were "indicative of independent contractor status" but that their "significance pales in the light of the substantial evidence of economic realities supporting the district court's determination of employee status.").

96. Reviewing the *Silk* and other factors, the Court concludes that Plaintiff is an employee of RF and not an independent contractor.

97. The first factor is the degree of control exercised by the alleged employer. Here, the degree of control exercised by RF and its foreman, (Doc. 79, Tr. at 62, 142), and co-owner, (*id*. at 170–172), Jorge Castillo, was considerable. Castillo "would give [Plaintiff], all the time, addresses of the site and the hours of work." (*Id*. at 36–37.)

98. Plaintiff testified credibly, "Well, I was told where to go, or if I were finishing a job, and [Castillio] would tell me, well, tomorrow we're working at the other site or they would call me and give me the address to go there." (*Id*. at 35–37.)

99. He testified unequivocally that Castillo "decided the time and the hours that [Plaintiff] was going to work." (*Id*. at 47.)

100. When asked whether he had a choice to work for another employer, he answered, "No. He [Castillo] will say it and we knew that if we missed one day, He will - - sometimes he will punish us." (*Id*. at 47–48.)

101. Once on the job site, he could not leave. (*Id*. at 63.)

102. While Castillo testified that Plaintiff was free to work for other companies and sometimes did, (*see, e.g., id*. at 143), the Court does not find Castillo's testimony credible.

103. It is clear from the record that Plaintiff did not work for RF continuously during 2018. (Joint Exhibits 1 and 2.) However, there is no credible evidence to support Defendants' position that this is because he was free to accept jobs with others. Indeed, Plaintiff's testimony, which the Court accepts, is to the contrary.

104. The first *Silk* factor weighs in favor of employee status.

105.     The second *Silk* factor measures the extent of the relative investments of the worker

and the alleged employer.  Here the evidence is overwhelming and uncontradicted that RF

Construction provided (either as owned or rented equipment) all of the equipment or tools

with the exception possibly of Plaintiff's personal tools. This included table saws,

specialized hand tools such as trowels and pneumatic nail guns, and other heavier

equipment such as Bobcats and excavators. Additionally, RF Construction, LLC provided

a box trailer that contained a significant portion of the tools and equipment for each project.

(Doc. 79, Tr. at 13–16.) Defendants agree that among the more expensive equipment

owned by RF and used on their jobs was a Bobcat and a work trailer with various tools

including table saws, pneumatic guns, and other handheld tools. (*Id.* at 74–75, 144, 159.)

106.     Therefore, the second *Silk* factor weighs in favor of employee status.

107.     The third Silk factor concerns the degree to which the worker's opportunity for

profit or loss is determined by the alleged employer. Here, Plaintiff and similarly situated

workers were paid a flat rate of $200 per day. The projects Plaintiff worked on and the

hours he worked were controlled by RF. In this regard, Plaintiff closely resembles the

workers in *Brock v. Mr. W. Fireworks*, *Inc.,* where the court stated: for "the most part, the

[worker's] only expenditures' from which they . . . obtain a return is [on] their own labor[,]

[s]uch returns are more properly classified as wages, not profits." *Brock,* 814 F.2d at 1050

(cleaned up). "By contrast, profit is the gain realized from a business over and above its

capital expenditures." *Id.* at 1050–51 (cleaned up). Thus, in *Brock,* the Fifth Circuit found

this factor weighed in favor of employee status because "the record reveals that these

operators are far more closely akin to wage earners toiling for a living, than to independent

entrepreneurs seeking a return on their risky capital investments." *Id.* at 1051.

108.    The Court concludes therefore that the *third* Silk factor weighs in favor of employee status.

109.    The fourth *Silk* factor considers the skill and initiative required in performing the job.

110.    Plaintiff testified that his concrete finishing work involved constructing the forms into which the cement or concrete is poured, assisting in the pouring of the concrete, and once poured, smoothing it. (Doc. 79, Tr. at 10–11.) Both Plaintiff and Defendants characterized the work as "labor." It is stipulated that "RF Construction, LLC paid [Plaintiff] $200 per day for his labor." (Doc. 57 at 2; *see also* Doc. 80 at 2, ¶ 2; Doc. 81 at 3, ¶ 25; Doc. 81 at 6, ¶ 49 ("Furthermore, Mr. Badillo-Rubio was simply a day laborer hired at $200 per day on an as needed basis."); Doc. 81 at 6, ¶ 48 (RF "only provided labor" for the jobs); Doc. 79, Tr. at 97, (Ford testified Plaintiff was "considered a day laborer").)

111.    "Routine work which requires industry and efficiency is not indicative of independence and nonemployee status." *Hopkins*, 545 F.3d at 345 (citing *Usery*, 527 F.2d at 1314). Such was Plaintiff's work, and therefore, this fourth factor weighs in favor of employee status.

112.    The fifth factor examines the permanency of the relationship. Here the evidence is more mixed. Plaintiff denied that he had "opportunities to go to other job sites to work for other companies." (Doc. 79, Tr. at 43.) He testified, "I have not worked for other companies." (*Id*. at 44, 47–48.) Yet, he also testified that he did work for Kenny Johnson Construction Co. (*Id*. at 32, 45.) He later testified he could not remember if he worked for Kenny Johnson. (*Id*. at 50.)

113.     This apparent contradiction is likely because Caronda Ford, the owner of RF
Construction, was also the Registered Agent and Manager of Kenny Johnson Construction
while it existed. (*Id*. at 111, 129.) It is clear that Plaintiff conflated the two companies. (*Id*.
at 30–31.) But this is a false issue since the record is clear that Kenny Johnson died on
December 13, 2017, and his company died with him. (*Id*. at 101.) The time period for which
Plaintiff is seeking overtime compensation for his work for RF is 2018.

114.     Joint Exhibits 1 and 2 submitted by the parties shows that Plaintiff worked for RF
for the week ending January 27, 2018 through the week ending April 14, 2018; for the
week ending May 11, 2018 and for the week ending September 22, 2018 through the week
ending October 6, 2018. These exhibits are supported by Plaintiff's testimony. (*Id*. at 9–
13.)

115.     Plaintiff was injured on the job on October 9, 2018 and did not return to work for
RF thereafter. (*Id*. at 54.)  The record is not clear why Plaintiff did not work for RF during
the other parts of 2018 not covered by Joint Exhibits 1 and 2. The Court finds that this
factor is equivocal.

116.      Plaintiff points the Court to what he contends is yet another factor, a recently
adopted rule of the U.S. Department of Labor, Wage and Hour Division. (Doc. 80 at 7, ¶
32.) Without citations, Plaintiff states that "it has been used by all other appeal circuits
outside of the U.S. Fifth Circuit." (*Id*.) According to Plaintiff, "this factor would weigh in
favor of the individual being an employee to the extent his or her work is a component of
the potential employer's integrated production process for a good or service." (*Id*. (citing
86 FR 1168, 1193).)

117.    While Plaintiff's job as a cement finisher is an essential component of RF's integrated production process for providing cement products, the Court finds it unnecessary to weigh this factor in its determination of employee vs. independent contractor status.

118.    The Court has carefully considered the evidence and concludes that the relevant factors weigh heavily in favor of Plaintiff's status as an employee.

### E.  Sums Owed to Plaintiff

119.    Having found that Plaintiff is an employee and that RF Construction is a covered enterprise, the next question is whether Plaintiff worked any overtime and, if so, what sums are owed to him.

### *1. Record-Keeping Obligation and Burden-Shifting*

120.    "Every employer subject to" the FLSA "shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder." 29 U.S.C. § 211(c).

121.    "An employee bringing suit for unpaid wages under the FLSA bears the burden of proving that he performed work for which he was not properly compensated." *Rosales v. Lore*, 149 F. App'x 245, 246 (5th Cir. 2005) (per curiam) (citing *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680, 686–87 (1946))  "If the employer's records are 'proper and accurate,' the employee may rely on these records; if the employer's records are 'inaccurate or inadequate,' the employee may produce 'sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.' " *Id.* (quoting *Anderson*,

328 U.S. at 687). "If the employee does so, the employer must 'come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.' " *Id.* (quoting *Anderson*, 328 U.S. at 687–88).

### 2.Regular Wage Rate and Wages Owed

122.      "The 'regular rate' under the [FLSA] is a rate per hour." 29 C.F.R. § 778.109.  The FLSA "does not require employers to compensate employees on an hourly rate basis; their earnings may be determined on a piece-rate, salary, commission, or other basis, but in such case the overtime compensation due to employees must be computed on the basis of the hourly rate derived therefrom and, therefore, it is necessary to compute the regular hourly rate of such employees during each workweek, with certain statutory exceptions discussed in §§ 778.400 through 778.421." *Id.*

123.      "The regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid." *Id.*

124.      "If the employee is paid a flat sum for a day's work or for doing a particular job, without regard to the number of hours worked in the day or at the job, and if he receives no other form of compensation for services, his regular rate is determined by totaling all the sums received at such day rates or job rates in the workweek and dividing by the total hours actually worked. He is then entitled to extra half-time pay at this rate for all hours worked in excess of 40 in the workweek." 29 C.F.R. § 778.112.

125.    Again, RF Construction paid Plaintiff $200.00 per day for his labor. (Stipulated Fact 3, Doc. 40 at 2)

126.    The evidence in this case shows that Mr. Rubio was paid a daily rate of $200.00 and that he generally worked a minimum of 12 hours each day. While this fact is disputed by foreman and co-owner of RF, Jorge Castillo, the Court finds the testimony of Plaintiff credible and that of Castillo not so. As such, Plaintiff's regular hourly rate of wage is $16.66, and his overtime premium is an additional $8.34.

127.    While RF disputes Plaintiff's testimony and calculations regarding the number of hours worked, it is undisputed that RF failed to record, keep and maintain Plaintiff's time records. (Doc. 79, Tr. at 81.) Ford had no personal knowledge of when Plaintiff or other RF workers arrived and left the work site. (*Id*. at 85.) Castillo also admitted that RF did not keep time sheets, and he did not know how many hours Plaintiff worked in 2018. (*Id*. at 160.) Accordingly, RF has failed to meet its burden, and the Court accepts Plaintiff's testimony on this issue.

128.    Based on the establishment of the regular rate and overtime premium, supported by Plaintiff's testimony and Joint Exhibits 1 and 2, Plaintiff is owed the following wages:

| Workweek | Pay | Days Worked[5] | Hours[6] | OT Hours[7] | OT Rate | OT Owed[8] |
|---|---|---|---|---|---|---|
| 1/27/2018 | $1000 | 5 | 60 | 20 | $8.34 | $166.80 |
| 2/2/2018 | $1200 | 6 | 72 | 32 | $8.34 | $266.88 |
| 2/10/2018 | $800 | 4 | 48 | 8 | $8.34 | $66.72 |
| 2/16/2018 | $800 | 4 | 48 | 8 | $8.34 | $66.72 |
| 2/23/2018 | $1000 | 5 | 60 | 20 | $8.34 | $166.80 |
| 3/2/2018 | $800 | 4 | 48 | 8 | $8.34 | $66.72 |
| 3/9/2018 | $1200 | 6 | 72 | 32 | $8.34 | $266.88 |
| 3/16/2018 | $700 | 3.5 | 42 | 2 | $8.34 | $16.68 |
| 3/24/2018 | $1200 | 6 | 72 | 32 | $8.34 | $266.88 |
| 3/31/2018 | $1100 | 5.5 | 66 | 26 | $8.34 | $216.84 |
| 4/9/2018 | $1200 | 6 | 72 | 32 | $8.34 | $266.88 |
| 4/14/2018 | $600 | 3 | 36 | 0 | $8.34 | $0 |
| 5/11/2018 | $700 | 3.5 | 42 | 2 | $8.34 | $16.68 |
| 9/22/2018 | $1200 | 6 | 72 | 32 | $8.34 | $266.88 |
| 9/29/2018 | $1000 | 5 | 60 | 20 | $8.34 | $166.80 |
| 10/6/2018 | $1350 | 6.75 | 78 | 38 | $8.34 | $316.92 |
|  |  |  |  |  |  |  |
| **TOTAL** |  |  |  | **312** | **$8.34** | **$2,602.08** |

### F.  Whether Ford is a Joint Employer

129.    The next question is whether Ford is also liable to Plaintiff for any damages arising

under the FLSA.

130.    Under the FLSA, " 'Employer' includes any person acting directly or indirectly in

the interest of an employer in relation to an employee[.]" 29 U.S.C. § 203(d).

131.    "The Supreme Court has determined that the FLSA's definition of 'employer' is to

be interpreted expansively." *Knaps v. Quality Refractory Serv., Inc.*, No. 19-13419, 2021

WL 136207, at *2 (E.D. La. Jan. 14, 2021) (Barbier, J.) (citing *Falk v. Brennan*, 414 U.S.

---

[5] Formula: Pay/$200(Day rate) = Days Worked.
[6] Formula: Days Worked X 12 Hours = Hours.
[7] Formula: Hours – 40 = OT Hours.
[8] Formula: OT Hours X OT Rate = OT Owed.

190, 195 (1973)). "Thus, '[t]he term employer includes individuals with managerial responsibilities and "substantial control over the terms and conditions of the [employee's] work." ' " *Id*. (quoting *Lee v. Coahoma Cnty.*, 937 F.2d 220, 226 (5th Cir. 1991) (quoting *Falk*, 414 U.S. at 194)). " 'If an individual with managerial responsibilities is deemed an employer under the FLSA, the individual may be jointly and severally liable for damages resulting from the failure to comply with the FLSA.' " *Id*. (quoting *Lee*, 937 F.2d at 226).

132.     "The Fifth Circuit uses the 'economic reality' test to determine whether an individual or entity is an employer, considering whether the putative employer: '(1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.' " *Id.* (quoting *Gray v. Powers*, 673 F.3d 352, 354–55 (5th Cir. 2012) (quoting *Williams v. Henagan*, 595 F.3d 610, 620 (5th Cir. 2010))). "Multiple individuals or entities may qualify as an employer so long as each independently satisfies this test." *Id.* (citing *Gray*, 673 F.3d at 355). "Additionally, an individual can qualify as an employer even without meeting each factor, so long as the individual was 'sufficiently involved in the operation of the' business." *Id.* (citing *Gray*, 673 F.3d at 357).

133.     Thus, for instance, in *Knaps*, the Eastern District denied a motion for summary judgment on the question of whether the president of the company and son of the company's sole owner was an employer for purposes of the FLSA.  *Knaps*, 2021 WL 136207, at *1–2.  The president had the ability to hire and fire employees, spent "50 to 60 percent of his time supervising," and "maintained personnel files on employees." *Id.* at *2.  Thus, even though the president did not meet the third factor (because he did not sign

29

checks and because the vice president "set the pay and made pay arrangement with employees," there was "enough evidence to create a genuine issue as to whether [the president] was sufficiently involved in the operation of [the company] to be considered an employer under the FLSA." *Id.*

134.    It is stipulated that Ford is a managing member of RF Construction. (Stipulated Fact 1, Doc. 57 at 2.)

135.    The evidence in this case shows that Ford maintained operational control over RF Construction, LLC, including but not limited to (a) the authority to hire and fire workers, including Plaintiff, (Doc 79, Tr. at 86); (b) had the authority to determine the rates of pay and method of payment, (*id*. at 86–87); (c) made the decision to classify her workers (including Plaintiff) as independent contractors thereby depriving them of overtime compensation, (*id*. at 87); (d) filled out Plaintiff's 1099 form, (*id*.); (e) signed Plaintiff's paychecks, (*id*. at 83); and (e) listed her home address as the business address for RF, (*id*. at 87).

136.    Ford's status as a joint employer of Plaintiff is supported by her conduct in the suit brought by RF and Ford against Plaintiff supposedly for recovery of the proceeds of a loan. Although Ford contends the funds lent to Plaintiff were RF's and not her own, Ford could not explain why she was a plaintiff personally suing for the return of the funds. (*Id*. at 114 ("You'd have to ask my lawyer.").)

137.    Under the Fifth Circuit's economic reality test, the Court finds that Ford is a joint employer of Plaintiff and is jointly and severally liable with RF for all amounts due to Plaintiff.

### G. Statute of Limitations

138.    Defendants assert that Plaintiff's FLSA claim is barred. (Doc. 81 at 4–5, ¶¶ 34–36.)

139.    "The relevant section of the FLSA imposes a two-year statute of limitations for violations of the FLSA." *Ramos v. Al-Bataineh*, 599 F. App'x 548, 551 (5th Cir. 2015) (citing 29 U.S.C. § 255(a)). "The statute of limitations is extended to three years for willful violations of the FLSA." *Id.* (citing 29 U.S.C. § 255(a)).  "To prove a willful violation, the plaintiff must establish that 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute.' " *Id.* (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 (1985))); *see also Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1324 (11th Cir. 2007) ("The three-year statute of limitations may apply even when the employer did not knowingly violate the FLSA; rather, it may apply when it simply disregarded the possibility that it might be violating the FLSA." (cited with approval by *Ramos*)).

140.    Thus, for example, in *Ramos*, the Fifth Circuit found no clear error in the district court's finding of a willful violation of the FLSA overtime requirements. The Fifth Circuit explained:

> [Employer] Al–Bataineh was aware of the FLSA and its overtime requirements, and although Al–Bataineh argued that he was unaware that [employee] Ramos worked over 40 hours per week, this assertion is refuted by the record. Ramos's very detailed personal records documented the 92 hours per week she worked and for which she was grossly underpaid. Al–Bataineh kept no such employment records. When an employer whose employee works over 90 hours per week chooses neither to keep records of their employee's time nor acknowledge their employee's presence for those extended hours, that employer can easily be said to have disregarded the possibility of violating the FLSA. *See Allen*, 495 F.3d at 1324. This is especially true here, as Al–Bataineh is

> attempting to turn a blind eye to the egregiously disproportionate
> ratio between the hours Ramos worked and the wages she was paid.
> This conduct most accurately constitutes a willful violation of the
> FLSA. Thus, the district court did not clearly err.

*Ramos*, 599 F. App'x at 551.

141.      Plaintiff filed suit December 20, 2018. (Doc. 1.)  Thus, Plaintiff is entitled to

recover all sums owed after December 20, 2016.  If the Court were to find that Defendants'

violations were willful, then Plaintiff could recover all overtime sums after December 20,

2015.

142.      Defendants' argument that Plaintiff's claim is prescribed presupposes Plaintiff's

claim is for 2014 wages which Plaintiff is not making. Indeed, Defendant argues,

"Petitioner's complaint pertains only to employment for 2014." (Doc. 81 at 4, ¶ 33.) This

is incorrect. Plaintiff's Complaint only alleges he was hired "in or about 2014", (Doc. 1 at

2), but he does not allege that he was due overtime wages in that year. His claim as

presented at trial is for 2018 overtime wages only. Clearly Plaintiff's claim was timely

filed. [9]

### H. Liquidated Damages

143.      "An employer who violates the FLSA's minimum wage and overtime provisions is

liable not only for the unpaid compensation but also for 'an additional equal amount as

liquidated damages.' " *Portillo v. Kincaid Inc.*, 826 F. App'x 384, 385 (5th Cir. 2020)

(citing 29 U.S.C. § 216(b)).

144.      "However, the district court can now decline to award such damages (or reduce the

amount) if the court concludes that the employer acted in 'good faith' and had 'reasonable

---

[9] The Court notes that Ford's testimony on this issue of RF's status as a functioning business in 2014 was
confusing and contradictory at best and disingenuous at worst. (Doc. 79, Tr. at 129–132.)

grounds' to believe that its actions complied with the FLSA." *Singer v. City of Waco*, 324 F.3d 813, 822–23 (5th Cir. 2003) (citing 29 U.S.C. § 260); *see also Portillo*, 826 F. App'x at 385 (same).

145.     "An employer faces a "substantial burden" of proving good faith and reasonableness." *Id.* at 385–86 (quoting *Steele v. Leasing Enters., Ltd.*, 826 F.3d 237, 246 (5th Cir. 2016) (citing *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1415 (5th Cir. 1990)). Further, "good faith requires a 'duty to investigate potential liability under the FLSA[,]' and that ignorance cannot be the basis of a reasonable belief." *Steele*, 826 F.3d at 246 (quoting *Barcellona v. Tiffany Eng. Pub, Inc.*, 597 F.2d 464, 469 (5th Cir. 1979)). "If an employer 'suspect[s] that [it is] out of compliance with the FLSA,' it cannot act in good faith." *Id.* (citing *Heidtman v. Cnty. of El Paso*, 171 F.3d 1038, 1042 (5th Cir. 1999)).

146.     " 'Evaluation of the evidence supporting good faith and reasonableness, however, is a discretionary determination.' " *Portillo*, 826 F. App'x at 386 (quoting *Steele*, 826 F.3d at 246 (citing *Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 357 (5th Cir. 1990))).

147.     Based on all the evidence as summarized above, the Court finds that Defendants failed to carry their burden of showing a good faith defense to the assessment of liquidated damages. Accordingly, Plaintiff is entitled to an additional $2,602.08 as liquidated damages from Defendants jointly and severally.

## I.   Attorneys' Fees

148.     Under the FLSA, "The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b).

149.      Plaintiff is the prevailing party in this matter, and as such, he is entitled to recover

his reasonable attorney's fees and costs of these proceedings from Defendants, jointly and

severally, which will be assessed based upon a motion to tax costs. (*Id.*)

### J.   Claim for FLSA Retaliation

150.      Plaintiff claims that the civil suit for repayment of a loan brought by RF and Ford

in the Baton Rouge City Court ("City Court Suit") was an unlawful retaliation against him

for bringing his FLSA action against RF and Ford. (Doc. 80 at 17–19, ¶¶ 75–84 (citing 29

U.S.C. § 215 and cases).)

151.      Defendants argue that the claim for retaliation lacks merit and should be denied

because (1) Plaintiff was not an employee of RF or Ford and therefore the FLSA does not

apply, (Doc. 81 at 13, ¶¶ 110–111); (2) "there was no adverse employment action taken

against [Plaintiff] because he was never an employee of RF Construction", (*id*. at 13, ¶

112); (3) "[i]t was [Ford's] understanding that [the City Court Suit] was subsequently

dismissed; therefore, her claim regarding the checks [were] dismissed" (*id*. at 14, ¶ 123);

and, (4) in any event, the City Court Suit was not brought in retaliation and has merit, (*id*.

at 14–15, ¶¶ 125–129).

152.      The City Court Suit was filed on April 9, 2021. (Doc. 79, Tr. at 4; Plaintiff's Exhibit

6) The parties agreed that, despite this issue not being raised in the Complaint or in the

Pretrial Order, the issue could be tried at the June 16, 2021 trial. (Doc. 79, Tr. at 4–6.)

Thus, the Court allowed this issue to be tried. Fed. R. Civ. P. 15(b)(2) ("When an issue not

raised by the pleadings is tried by the parties' express or implied consent, it must be treated

in all respects as if raised in the pleadings.")

153.     "[I]t shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter . . . ." 29 U.S.C. § 215(a)(3).

154.     For purposes of the McDonnell Douglas summary judgment burden shifting analysis, "a plaintiff must make a *prima facie* showing of (1) participation in protected activity under the FLSA; (2) an adverse employment action; and (3) a causal link between the activity and the adverse action." *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir. 2008) (quoting *Hagan v. Echostar Satellite L.L.C.,* No. 05–1365, 2007 WL 543441, at *4 (S.D. Tex. Feb. 16, 2007)).

155.     But,

> …after a full trial on the merits, a district court must look at whether the plaintiff had presented sufficient evidence to allow a jury to arrive at a verdict, i.e., whether the plaintiff has met his ultimate burden of proving discrimination or retaliation (depending on the statute at issue), rather than simply focusing on the plaintiff's *prima facie* case. This Circuit has phrased the question for the jury as "the ultimate question of whether a defendant took the adverse employment action against a plaintiff because of . . . protected status."

*Id.* (internal citations omitted).

156.     Because this case has been tried on the merits, the question before the Court is whether "but for" Plaintiff's protected activity (the filing of an FLSA overtime suit), RF and Ford would not have filed the City Court suit against Plaintiff. *Mumfrey v. CVS Pharmacy, Inc.*, No. 10-124, 2012 WL 12978275, at *5 (E.D. Tex. Mar. 12, 2012), *aff'd*, 719 F.3d 392 (5th Cir. 2013).

157.    "On this ultimate question, [Plaintiff's] ' "*prima facie* case, combined with sufficient evidence to find that [RF and Ford's] asserted justification is false, may permit the [Court] to conclude that [RF and Ford] unlawfully [retaliated]." ' " *Id.* (quoting *Evans v. City of Houston*, 246 F.3d 344, 350 (5th Cir. 2001) (quoting *Reeves v. Sanderson*, 530 U.S. 133, 148 (2000))).

158.    Courts have held that the discrimination constituting retaliation may include non-employment related actions. *See, e.g.*, *Arias v. Raimondo*, 860 F.3d 1185, 1188, 1191–92 (9th Cir. 2017) (where court found that employer's attorney could be held liable for retaliation under FLSA for informing Immigration, Customs and Enforcement that plaintiff was not lawfully present in the United States in an effort to prevent FLSA trial from going forward).

159.    The term "person" as used in 29 U.S.C. § 215 is not limited to the employer and may be anyone, even if not a covered enterprise under the FLSA. *Acosta v. Foreclosure Connection, Inc.* 903 F.3d 1132 (10th Cir. 2018); *Arias*, 860 F.3d at 1192; *Sapperstein v. Hager*, 188 F.3d 852, 856–57 (7th Cir. 1999).

160.    The Fifth Circuit has held that ". . . the FLSA's broad authorization of 'legal and equitable relief' encompasses compensation for emotional injuries suffered by an employee on account of employer retaliation." *Pineda v. JTCH Apartments, L.L.C.*, 843 F.3d 1062, 1066 (5th Cir. 2016). *See also Starnes v. Wallace*, 849 F.3d 627, 636 (5th Cir. 2017).

161.     Considering the evidence submitted by both parties on this issue, the Court finds that the evidence strongly supports its conclusion that the City Court Suit was brought by Ford and RF in retaliation for Plaintiff's FLSA claim against them (a protected activity)

and represents a violation of this statute. The Court finds that Plaintiff has met his burden under § 215.

162.    The payments made by RF to Plaintiff that form the basis of the City Court Suit were made following Plaintiff's on the job accident of October 8, 2018, for which Plaintiff underwent surgery the following day. (Plaintiff's Exhibit 6 at 1, ¶¶ 5–6.) The payments are labelled on RF's bookkeeping summary as "Free Checks" (Joint Exhibit 1; *see also* Doc. 79, Tr. at 98–99) and are shown as six weekly payments made from October 13, 2018, until November 17, 2018, totaling $5,400. (*Id*.) The term "Free Checks certainly suggests that these payments were not being made as a loan that Plaintiff was expected to repay.

163.    Although these payments were, according to Ford and Castillo, an "unsecured loan" made to the Plaintiff "in an effort to help [Plaintiff]," (Plaintiff's Exhibit 6, ¶ 8; Doc. 79, Tr. at 98–99, 106–107), the Court rejects that explanation as mere pretext. There was never any effort made to secure a repayment of the "loan" until the City Court Suit was filed April 9, 2021, some two and a half years after the payments were made. The City Court suit was filed, not coincidentally, after the trial of this case began on February 25, 2021, (Doc. 74), and before it ended on June 16, 2021, (Doc. 83; *see also* Doc. 79, Tr. at 116).

164.    Furthermore, Ford's and RF's allegations in the City Court Suit are contradicted in significant ways by Ford's and Castillo's in-court testimony and lead this Court to the conclusion that the allegations and Ford's testimony were not credible. For instance, the City Court Suit alleges that ". . . Petitioner Caronda Ford agreed to pay Defendant while he was recovering from surgery because he claimed he would be unable to work during that time." (Plaintiff's Exhibit 6, ¶ 9.) Yet, Castillo testified that Ford was unaware that he

had made the "loans" to Plaintiff until the situation with the payments "got out of control." (Doc. 79, Tr. at 150.)

165.    The City Court Suit alleges that "[t]he verbal contract was made and approved by Petitioners [Ford and RF] with the understanding and agreement that he would begin repaying the money after he was able to resume work after his recovery." (Plaintiff's Exhibit 6, ¶ 10.) Yet, when asked by her lawyer, "When you relented and when Mr. Castillo represented to you that he wanted to assist Mr. Rubio because he was unable to work because of his injury, did you discuss with Mr. Castillo any terms of providing these so-called free checks to Mr. Rubio?", Ford answered, "No ma'am. Again, I was against it and I just left it up to him, told him whatever he decided." (Doc. 79, Tr. at 106–107; *see also id.* at 113.)

166.    In addition, although Ford contended at the trial that the "loans" were made by RF and not her, she could not explain why, if this was the case, she sued Plaintiff individually for the return of the payments. (*Id.* at 113–114.)

167.    For reasons previously stated by the Court, the Court did not find Castillo to be a credible witness either and does not credit his explanation of the "Free Checks" paid to Plaintiff.

168.    The Court concludes that the "Free Checks" were not a loan, but rather, were paid by RF to Plaintiff in order to partially satisfy its obligations to Plaintiff under the Louisiana Worker's Compensation Act without having to acknowledge that Plaintiff was an employee of RF.

169.    In any event, the Court finds that RF and Ford's City Court Suit was brought in retaliation for Plaintiff having sued them under the FLSA and was a violation of 29 U.S.C.

§ 215(a)(3) and that, had it not been for Plaintiff's FLSA claim against them, the City Court

Suit would never have been filed.

170.     Plaintiff testified that the lawsuit against him made him nervous and that he

"couldn't get that out of [his] mind." (Doc. 79, Tr. at 28–29.)

171.     The Court concludes that Plaintiff is entitled to recover from Defendants, jointly

and severally, the sum of $2,500.00 for emotional distress.

**V.     Conclusion**

172.     In conclusion, the Court finds that Plaintiff has proven that he was an employee of

RF and Ford for purposes of the FLSA; that he is entitled to judgment in favor against RF

and Ford, jointly and severally, for overtime wages in the amount of $2,602.08, liquidated

damages in the amount of $2,602.08, attorney's fees and costs in an amount to be set by

the Court, and mental and emotional distress damages in the amount of $2,500.00.

173.     A judgment will be issued accordingly.

Signed in Baton Rouge, Louisiana, on <u>March 17, 2022</u>.


**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**